## HARTZ v. CLEVELAND BLOCK CO.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1899.)

### Nos. 688, 689.

1. EQUITY PLEADING—PLEA AND REPLICATION—REVIEW.

When, after a plea is set down for argument as insufficient in law, the court permits it to be amended, and a replication is then filed, and a hearing had upon evidence bearing on the issue thus made, and the court thereupon finds that the plea is supported, and dismisses the bill, the only question open for review is the question as to whether the plea is sustained by the evidence.

2. PATENTS—CONTRACTS FOR THE ASSIGNMENT OF INVENTIONS AND PATENTS.

The owner of a machine shop, who had invented a metallic snatch block, entered into an agreement with a company whereby it was to pay him "all the costs and expenses of making and perfecting such invention and obtaining patents," in consideration whereof he was to have the right to manufacture at a reasonable profit all the snatch blocks, tackle, etc., which the company should put upon the market. Thereafter he perfected one snatch block, and obtained a patent therefor, and while so doing he presented weekly bills to the company for labor, material, and expenses incurred in working out his ideas, together with the cost of tools, dies, patterns, etc., and such bills were paid by it. Held, that this was a practical construction of the contract by the parties, and the company could not thereafter, in respect to subsequent inventions, claim that it was only obligated to pay merely the cash outlay in obtaining the patent.

Appeals from the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

The appellant, who was complainant below, filed this bill to restrain the infringement of patent No. 442,679, granted to Henry V. Hartz, December 16, 1890, for a snatch and tackle block. To this bill the defendant filed a plea, which, in substance, averred that the defendant was a corporation engaged in the business of manufacturing and selling snatch and tackle blocks and analogous devices, but had no factory of its own; that the complainant, Hartz, was the proprietor of a well-equipped machine shop, and had between 1886 and 1892 made for appellant, at agreed prices, all the snatch and tackle blocks needed in its business; that "in or about the year 1888" the defendant entered into an oral agreement with complainant by which he obligated himself to assign to defendant all United States patents which might be granted to him for inventions relating to metal snatch and tackle blocks while the agreement was in force, the defendant agreeing to pay him "all the costs and expenses of making and perfecting such inventions and obtaining patents"; and also that in consideration of such promise the complainant "should have the right to manufacture at a reasonable profit all the metal snatch and tackle blocks which defendant should put upon the market and sell." The plea further averred that said contract continued in existence from "in or about 1888" until November, 1892, when, without cause, the complainant refused to make for defendant

such blocks as it wanted, and entered into an agreement with another dealer; that during the continuance of this agreement, complainant, at the suggestion and for the benefit of defendant's trade, perfected these several inventions for which he procured patents,—the first of these being for a snatch block protected by patent No. 387,071, dated July 31, 1888. The second was that secured by patent No. 442,679, for a snatch and tackle block, issued December 16, 1890; and the third and last being for the invention of a tackle block, covered by patent No. 470,240, issued March 8, 1892. It is averred that patent No. 387,071 was assigned, shortly after it was taken out, to the defendant, but that the complainant has refused to assign the other two patents which were taken out during said agreement for inventions made and perfected during said agreement, although defendant "has made demand upon the complainant to transfer and assign same, and has offered to pay and to reimburse the complainant for the cost and expenses incident to obtaining the patents and reducing the inventions to practice." The plea concludes with the averment that complainant is obtaining patents for said inventions; "was, by reason of the premises, simply a trustee for defendant; and in equity and good conscience holds no title to or interest in said patent, save as trustee for the defendant." Replication was filed, and proof taken. Upon final hearing the plea was sustained, and the bill dismissed. A similar bill was filed for infringement of patent No. 470,240, and a like plea filed by defendant, upon which issue was taken. Upon final hearing this bill was also dismissed. Complainant has appealed from both decrees, and by stipulation the causes have been heard together upon one record and assignment of error.

J. E. Ingersoll and Samuel T. Douglass, for appellant.

Harvey D. Goulder, for appellee.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The hearing was upon the plea, a general replication, and the evidence taken in support of the plea. Such a plea is a special answer to the bill, and nothing is put in issue, so far as the plea extends, but the truth of the matter pleaded. Farley v. Kittson, 120 U. S. 303–315, 7 Sup. Ct. 534; Dalzell v. Manufacturing Co., 149 U. S. 315, 13 Sup. Ct. 886. The original plea was set down for argument as insufficient in law. The court permitted the plea to be amended. To the plea, as amended, the complainant took issue by a general replication. Upon the evidence bearing upon the issue thus made the court found that the plea was supported, and dismissed the complainant's bill. No error has been assigned upon the ruling of the court in sustaining the plea as sufficient in law. The only question thus open is as to whether the court erred in holding that the plea was sustained by the evidence. If it was not supported, it should have been overruled, and the defendant ordered to answer. Dalzell v. Manufacturing Co., 149 U. S. 315, 326, 13 Sup. Ct. 886; Farley v. Kittson, 120 U. S. 303, 315, 318, 7 Sup. Ct. 534.

The evidence does not, in our judgment, support the plea. The plea avers that the contract was made "in or about 1888,"—a most vague and indefinite date. The evidence, if possible, leaves it still more uncertain, and leaves it probable that the conversation relied upon as constituting the agreement sought to be set up occurred some time in 1887. The plea makes no averment touching the duration of the alleged agreement. The evidence is that nothing was said

about the duration; and counsel for appellee, in order to take the case without the statute of frauds, have urged that under the evidence it was an agreement "which could have been terminated by either party at any time upon reasonable notice." The prices to be paid Hartz for making such blocks as the block company had occasion for are shown to have been agreed upon for one year. This makes it altogether probable that the understanding of the parties was that the agreement under which Hartz was to get all the work needed by the block company was to continue but for one year. From this it would follow that only during that year was he under any obligation to assign to them patents taken out for improvements in blocks. The greatest uncertainty in the evidence supporting the plea is that which relates to the consideration to be paid Hartz for his inventions. The expense incident to experimenting and developing new ideas was great. The cost of patterns, dies, and machinery for the practical manufacture of improved snatch and tackle blocks was out of all proportion to the other costs incident to the obtention of a mere paper patent. Who was to bear the cost of tools, materials, labor, etc., used in devising and perfecting such new inventions as might be suggested to the mind of Hartz? Who was to pay for the plant necessary to the practical manufacture of new inventions? The plea avers that "defendant was to pay the costs and expenses of making and perfecting said inventions and obtaining said patents." But Mr. Lyman, who represented his company in the making of the alleged agreement, in stating the bargain says Hartz "agreed to do any such work as was necessary to improve or change any block that we might desire changed, or to make such new inventions as had been the work of Mr. Ford in the past, free of cost to the block company. except the actual money outlay or cost of patents when procured, we agreeing to give him the exclusive manufacture of the blocks in consideration of such work." He was asked if this expense to be reimbursed was to be confined "to the expense that attorneys might charge," and answered:

"It was confined to the actual cash outlay for the obtainment of the patent. Q. Did that include nothing more than the expense that attorneys might charge? A. Whatever expense was necessary to obtain the patent. I don't know what they are. Q. Wasn't it talked over that there would have to be various expenses in making patterns and making experiments, to see whether the invention was really a practical one, before the patent was applied for? Wasn't that talked over between you and Hartz? A. Yes, sir; and Hartz didn't desire any pay for that. Q. Did he say he did not to you? A. He did. Q. Is it not a fact that he presented accounts to you to cover the expense of patent 387,071, covering just such items of expense, and that the block company reimbursed him for the same? A. Not to my knowledge."

The fact was that complainant did undertake to get out a metal snatch block some time in 1888, being the device covered by patent No. 387,071, and that every expense incurred by him for material and labor in the course of his experiments, as well as the entire cost of tools, dies, patterns, etc., used in working out his ideas or in preparation for the practical manufacture of his improved tackle block was presented to the defendant company from time to time as the expense accrued, and paid. These items aggregated, including

attorney's fees for securing a patent, the sum of $937.88. From week to week Hartz presented his expense bill, and had it paid; and, so soon as the patent issued, he assigned it to the block company. Now, is this court to find the contract to be one which required Hartz to incur the cost of experiments and of patterns, as claimed by Mr. Lyman, the secretary and treasurer of the company, and the officer who says he made the contract, or is it to find that the agreement was as construed by the parties themselves with respect to the patent which was assigned to the block company? If we construe the plea as averring an agreement under which Hartz was to experiment and perfect devices for improving snatch and tackle blocks, and to make such patterns, dies, tools, and machinery as were necessary to the manufacturing of such improvements, at his own expense, being reimbursed only to the extent that he had paid out money for the actual procurement of a patent and by the profit he might make upon such improved blocks as the block company might choose to order from him, no such agreement is proven. The fact that he was reimbursed for all his outlay in perfecting the device covered by patent No. 387,071, which he did assign to the company in 1888, including cost of dies, patterns, and tools for making the blocks covered by that patent, and that such reimbursement was made from week to week, as the work was done or the expense incurred, without question or controversy, is a demonstration that that invention, at least, was devised, perfected, patented, and assigned under an agreement quite unlike that stated by Mr. Lyman.

The alleged agreement of 1887 or 1888 was not even the origin of the business relation of Hartz and the block company. The plea avers that those relations had begun in 1886. The evidence shows that for years prior to 1886 the same relation had existed between those who became incorporated in 1886, and who, as a corporation, continued to have their metal blocks made by Hartz as theretofore. Hartz was an independent manufacturing mechanic, having his own machine shop, and doing work at all times for all who applied. He made blocks from 1886 to 1892 for the block company, at prices agreed upon, from time to time, prior to 1888. The superintendent of the block company was one Ford, who was perhaps looked to for suggestions as to improvements in the articles dealt in by the corporation. In 1888 Ford sold his stock to the daughter of Hartz, and the latter, though never a stockholder, was made a director in Ford's place. He explained that he was never qualified, but 'the other directors said it made no difference, he could act as one anyhow. The stock held by Hartz's daughter was but 10 shares, and of no significant interest. Hartz says that while occupying this doubtful relation he was asked if he could not devise for the company a metal snatch block which would enable them to compete with makers of wooden blocks, and that he did get out a model, charging them with labor and material. That then, at their request, he made patterns, dies, tools, etc., for which he was paid his expenses from week to week, and that he caused this invention to be patented, and assigned the patent the next day after he received it, they paying every expense incident to its issuance,

as well as all his cost and expenses for tools, dies, machinery, etc., proper for the practical manufacture of such blocks under that patent. Thereafter he made for the block company all snatch blocks, according to that patent, which they had from time to time desired, they furnishing him with material, and paying him for his work a price agreed upon from time to time. He denies that he had any general agreement that he was to make inventions for them as charged. With reference to his invention as covered by patent No. 442,679, Hartz says that the company in 1889 complained that their block was not strong enough; that he made two models of a steel block, one 10-inch single and one 10-inch double, and took them to the office, and showed them to Mr. Upson, one of the managers of the company; that Upson asked what the tools, patterns, machinery, etc., for their manufacture would cost, and that he replied, "About $5,000, but it might cost more." Upson desired to consult the other directors, and, after doing so, reported that the company was not willing to go to such an expense; that they had a sale for their blocks, and would not care to put so much money into any other block. Further improvements were afterwards made upon these models, including the snatch-block attachment, and patent No. 442,-679, taken out. He then says that he got an order for two large snatch blocks, and made the head according to his new design; that, when delivered, Mr. Keith, their superintendent, said he could not accept them, but that he urged him to send them out, and that, if returned, he would pay all costs; that they were sent out, and were satisfactory; and that thereafter he received orders for a number during 1891 and 1892, filling the orders at an agreed price. The blocks thus made were very large hand-made blocks. To make smaller ones at a price which would enable him to compete with other styles, he had to make special tools, dies, patterns, and machinery, all of which he did at his own expense, and with the knowledge of the company. No part of the cost and expenses, amounting, as he says, to $8,000, was ever borne by the block company, or offered to be paid by it. On one occasion, he says, Mr. Upson came into his shop where he was engaged in making a special machine for making the cheek pieces of the new snatch block, and asked what the machine would cost. He replied, "$1,000, but it might go to $2,000." To this Upson replied: "Say $1,000, or a little more. We are willing to pay half of it. Will that be satisfactory?" To which he replied, "No." This, Hartz says, is the only time that anything was said to him about paying any part of the cost of the new invention, or of preparing for making the new block. In some important particulars Mr. Hartz is corroborated in respect to the history of this new invention. Mr. Upson, after stating that he and others of the company had made certain suggestions concerning a new form of snatch block to Hartz, and in answer to a question as to what had been said to Mr. Hartz after he had made and exhibited the two models mentioned by Mr. Hartz in his testimony, says:

"The models were left to be shown to the directors of the company. We couldn't take the responsibility of going ahead and making the block without

showing and consulting with the directors. Q. After you had consulted with the directors, what talk did you have with Mr. H. about manufacturing the steel block? A. Why, they wanted an estimate from him as to the probable cost of it, or the machinery to make them. Q. Mr. Hartz has stated that after you had seen these two models, you, in behalf of the Cleveland Block Company, declined to put any money into the making of tools and patterns for these blocks. And he 'says that you did not tell him, as a reason for this refusal, that the manufacturers of wood blocks had raised their price so that the block company could now compete with profit with their malleable blocks. You may state whether Mr. Hartz was correct in this statement of his, and, if not, say what, if any, conversation upon this subject you did have with Mr. Hartz. A. I can't remember conversation on that point. Q. Do you remember having any conversation with him on that point? A. Very likely we did." '

Mr. Lyman, when asked why Hartz did not go on with his invention, and make the dies, patterns, etc., necessary for the practical manufacture of the new steel block, said:

"A. The expense—I don't know just how I want to state that—the expense of manufacture, or rather the preparation to manufacture, the new block, was such that I had not considered it necessary to make a change in our snatch block, except as regarded the extra large sizes, which were made by hand, of which very few were made. Q. In what manner was the block company interested in the expense you have referred to in your last answer? A. To the extent that I considered it necessary for any one to put any more money into machinery for new styles of blocks, and also into expense of advertising and introducing new blocks, as long as the profits on the style we were using, and the sale of it, were satisfactory."

It is plain that "necessary," in the answer last set out, was "unnecessary." This is the plain meaning of the witness. But even stronger corroboration of Mr. Hartz's statement as to the attitude of the company towards his new steel block exists. The record book of the Cleveland Block Company contains these two entries:

"Cleveland, March 1, 1892.

"The adjourned meeting of stockholders was held, Mr. McLaughlin in the chair. Mr. H. F. Lyman made a statement in relation to the new steel block which it was proposed to introduce to the trade in competition with the steel block made by other parties, and several suggestions were made with the view of buying certain machines made by Mr. Hartz. No action was taken, but the matter was referred to the directors to consider."

"Cleveland, March 1, 1892.

"A meeting of the directors was called to consider the question, which was overlooked, of sharing with Mr. Hartz the expense of building machines for making the steel blocks, and the treasurer was authorized to guaranty at least $500.00 toward the expense. Said amount, in case of success, to apply upon the purchase of such machines."

Bearing upon the indefiniteness and onesidedness of the agreement sought to be set up by defendant's plea, is the fact that Mr. Hartz's only compensation for the assignment of all patents taken out by him consisted in his having the business of the block company in the making of the blocks needed by them. We have already commented upon the indeterminate character of this agreement in respect to time. It is equally so in regard to price. The plea says that Hartz was to have the right to make all blocks required at a "reasonable profit." The evidence does not support this. The testimony of Lyman and Upson is that prices for one year were settled, but that afterwards there were to be such prices as could

be agreed upon; that is, the defendant was at liberty to give its work to some one else after the agreed schedule expired, unless Hartz would take such prices as they were willing to pay him. The evidence is hopelessly conflicting upon all the material issues of the plea. That the agreement was such as stated in the plea is highly improbable, and the agreement made by the evidence of Lyman and Upson still more so. The company was not bound to continue this agreement for a day, nor obliged to reimburse Hartz for cost of experiments or of plant essential in making his new devices. Such a contract is inconceivable and unconscionable. Even if clearly proven, it is not such a contract as a court of equity should specifically enforce. Dalzell v. Manufacturing Co., 149 U. S. 315–323, 13 Sup. Ct. 886.

The contract set out in the plea is both indefinite and improbable. The evidence introduced in support of the plea tends to establish an agreement still more indefinite and unconscionable. The truth of the agreement as averred is not proven to our satisfaction. The probabilities are with the statement made by Hartz that his agreement was limited to the specific device assigned by him to the defendant in 1898. But independent of all question as to the definiteness and fairness of the contract deposed to by the members of the defendant corporation, and as to the sufficiency of the evidence to support the plea, we hold that the conduct of the defendant company in refusing to furnish Hartz with the tools, dies, patterns, and machinery necessary to make for them the blocks needed by them was an abandonment of their agreement to pay him "all the costs and expenses of making and perfecting such invention and obtaining patents." That term of the agreement, as interpreted and applied by the parties in respect to the invention of 1898, covered by patent No. 387,071, included the necessary plant for manufacturing the devices covered by the patents to be assigned to them. If it be true, as claimed, that the company asked Hartz to devise a new steel block, which in strength and cheapness would compete with anything known, and he did so, the company was bound to prepare for the practical use of the invention if they wished the benefit of the device. To say that Hartz should have gone to an expense of $8,000, as he did, in experimenting and perfecting such a block, and in making tools, dies, patterns, etc., for its practical manufacture, with no chance of a return save in the profit he might make upon such blocks as they might choose to take from him, is incredible. If defendant's contention is true, the company might have left Hartz with all such machinery on his hands, with no right to make a block under his own patent. But the learned counsel for appellee denies that the block company refused to bear the expenses incident to the development and manufacture of the new steel blocks. To quote from brief of counsel:

"As a matter of fact, it did not refuse. Its managers, knowing the condition of the market, said, in substance: 'This is not the time to go to such expense. For the present, and while we can make money with our present tackle blocks in competition with the wooden blocks, such expense is unbusiness-like. Later, we may; but, for reasons stated, not now.'"

If this position be conceded, it would operate to deprive the inventor of all benefit from his patent. Hartz could neither use the invention for himself nor realize the meager benefits to be derived from using it for the benefit of the block company. We think they elected to repudiate any right they may have had to become the assignee of this invention, and that they so understood it when they stood by and saw Hartz involving himself in great expense, after themselves refusing to furnish the means to prosecute its manufacture. Defendant's plea is not supported. The decree must be reversed for such further proceedings as may be consistent with this opinion.